IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **CURTIS FORD,** | ] | **CIVIL ACTION NO.** |
| **PLAINTIFF,** | ] | **CV-02-BE-2672-S** |
| v. | ] | |
| **GLASFORMS, INC.,** | ] | **ENTERED** |
| **DEFENDANT.** | ] | JAN - 7 2004 |

### MEMORANDUM OPINION

This case is before the court on the "Defendant's Motion for Summary Judgment" (Doc. 41). The court reviewed the briefs and evidentiary submissions by both parties and held a hearing in this case on December 16, 2003. For the reasons stated on the Record and elaborated below, the court finds that the Defendant's Motion for Summary Judgment is due to be GRANTED.1

### Procedural History

Plaintiff Curtis Ford filed suit on October 30, 2002 against his former employer Glasforms, Inc. ("Glasforms") alleging race discrimination and retaliation in violation of Title VII and 42 U.S.C.

---

1 During oral argument, the court informed the parties of its intention to grant summary judgment in favor of defendant. The court asked counsel for defendant whether he would like to prepare a proposed memorandum opinion for the court. Counsel for defendant subsequently informed the court that he would prepare a proposed memorandum opinion and would send a copy of the proposed opinion to counsel for plaintiff for review and comment. The court has adopted a large part of the proposed opinion prepared by defense counsel. The court is aware of the admonition of the Eleventh Circuit that the district courts not delegate "the task of drafting important opinions to litigants." *Chudasama v. Mazda Motor Corp.,* 123 F.3d 1353, 1373 n. 46 (11th Cir. 1997). In this case, however, the court had reached a firm decision as to the appropriate outcome and stated the reasons on the Record in open court before asking defense counsel if he would like to submit a proposed memorandum opinion. Defense counsel drafted the opinion according to the express instructions of the court as to the reasons summary judgment is warranted. These instructions were stated to defense counsel, with plaintiff's counsel present, following oral argument. Further, the court personally reviewed this opinion and it reflects the court's own conclusions.

681075.1

§ 1981. Although Ford's submissions to the court did not clearly identify all the claims he was asserting in this case, at oral argument, Ford's counsel articulated his claims as follows: (1) race discrimination termination claim; (2) race discrimination promotion or compensation claim; and (3) retaliation termination claim.

Facts[2]

On April 5, 2000, Glasforms hired Ford in its Material Handling Department as a Material Handler I, which is a pay grade "A" position pursuant to Glasforms's Pay/Rate Scale. Ford subsequently completed the requisite training and passed a test required to be promoted to the Material Handler II position, which is a pay grade "B" position. Upon his promotion to the Material Handler II position on December 4, 2000, Ford received an increase in hourly pay.

On October 17, 2001, at his request, Ford was transferred from the Material Handling Department as a Material Handler II to the Production Department as a Production Assistant II, which is a pay grade "B" position. Upon being transferred to the Production Department, Ford began training on the operation of machines in an effort to become a Machine Operator I, which is also a pay grade "B" position. Ford's plan was to become a Machine Operator I, which was a prerequisite to be promoted to the Machine Operator II position, which is a higher pay grade "C" position.

Because Ford held a pay grade "B" position and he had no previous experience as a Machine Operator prior to his transfer to the Production Department, Ford was required to complete the training and pass the test for the Machine Operator I position without a pay increase before being allowed to complete the training and pass the test for the Machine Operator II position and receive a pay increase. Pursuant to Glasforms's past practice and procedures, a lateral transfer within the same pay grade will not result in a pay increase unless the lateral move is considered a "promotion," where additional quality assurance or leadership duties are assigned to the employee. A transfer from the Production Assistant II position to the Machine Operator I position, both of which were pay grade "B" positions, was not a "promotion" under Glasforms's system.

---

[2] Citations to the parties' submissions are omitted.

681075.1        2

On November 20, 2001, Glasforms management requested Ford to sign an Hourly Title and Pay Adjustment form ("Adjustment Form") that contained information regarding Ford's transfer from the Material Handling Department to the Production Department. All Glasforms employees are required to sign an Adjustment Form after their transfer or promotion to a new position. Completion of the Adjustment Form is part of Glasforms's efforts to maintain certification for ISO 9002, a quality assurance program. The Adjustment Form that Ford was requested to sign contained the following hand-written comments at the bottom:

> In order to make further advancement in production [Ford] must complete the 90 day Training packet. He must pass the Machine Op. I Test with no [additional] compensation before he is eligible To Take Machine Op. II Test for [additional] compensation. ….

The above-quoted information was written on the Adjustment Form to provide Ford with advanced communication about his progression or promotion path. Similar information had been provided to other Glasforms employees on their Adjustment Forms.

Ford refused to sign the Adjustment Form because of the hand-written comments on the Adjustment Form relating to the Machine Operator I position, because he believed he would be entitled to an increase in pay once he completed the training and passed the test associated with the Machine Operator I position, even though his placement in the Machine Operator I position would be a lateral move within the same pay grade. Glasforms management told Ford to either sign the Adjustment Form or be fired. Ford also received a Supervisor-Employee One-On-One Meeting Form that stated that he must sign the Adjustment Form to continue employment with Glasforms. In response to being informed that he must sign the Adjustment Form or be fired, Ford asked for time to think about his decision. Ford accordingly was given a day to consider whether he would sign the form.

On November 21, 2001, the following day, Ford still refused to sign the Adjustment Form. He was then suspended from employment for three days for his refusal. At the time of his suspension, Ford again was told to sign the Adjustment Form or his employment would be terminated.

681075.1        3

On that same day, November 21, 2001, Ford presented Glasforms management with a hand-written memorandum stating as follows:

> On 11/20/01 I was inform ... to sign the Pay or Position adjustment form, in which in a handwritten statement informing me of releasing my rights to any compensation for [successfully] completing Machine I test. On this form you'll also inform me that I must then complete another 90 day training before I could proceed to take Machine II test, only after 180 days training or more could I receive any compensation. I would like to know why wasn't any of the white employee[s] ask[ed] to sign this form with these condition[s] and I was intimidated to do so.

Ford never signed the Adjustment Form. On November 28, 2001, Glasforms terminated Ford's employment because he refused to sign the Adjustment Form.

At the time of Ford's termination from employment, Glasforms's workforce was approximately 45% African-American. Seven of the sixteen Machine Operators were African-American. An African-American was hired by Glasforms immediately after Ford's termination from employment.

**Standard for Summary Judgment**

When a district court reviews a motion for summary judgment under Federal Rules of Civil Procedure 56, it must determine two things: (1) whether any genuine issues of material fact exist; and, if not, (2) whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To succeed, the moving party bears the burden of establishing both prongs of the summary judgment test. The nonmoving party may defeat the motion for summary judgment by establishing either genuine issues of material fact or that the movant is not entitled to judgment as a matter of law.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) (quoting Fed. R. Civ. P. 56). The party seeking

summary judgment can meet this burden by offering evidence showing no dispute of material fact, or by showing that the nonmoving party's evidence fails to meet some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." 477 U.S. at 323.

When the moving party has met his burden, Rule 56 (e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P 56 (e)). The responding party does not need to present evidence in a form admissible at trial; "however, he may not merely rest on his pleadings." 477 U.S. at 324. "The plain language of Rule 56 (c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

In responding to a properly-supported motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).

Substantive law determines which facts are material and which are irrelevant. Anderson, 477 U.S. at 248. A dispute raises a genuine issue of fact "only if a reasonable jury considering the evidence presented could find for the nonmoving party." Anderson, 477 U.S. at 249. Material facts affect the outcome of the trial under governing law. 477 U.S. at 248. To determine whether a material fact exists, the court must consider all the evidence in the light most favorable to the

nonmoving party. Anderson, 477 U.S. at 249; Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002); Witter v. Delta Airlines, Inc., 138 F.3d 1366, 1369 (11th Cir. 1998).

After both parties have addressed the motion for summary judgment, the court must grant the motion if no genuine issues of material fact exist and if the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which the jury could reasonably find for the nonmovant. Anderson, 477 U.S. at 254; Cottle v. Storer Communications, Inc., 849 F.2d 570, 575 (11th Cir. 1998). The court should not weigh the evidence, or make determinations as to the credibility of witnesses because these decisions fall to the provence of the jury. See Anderson, 477 U.S. at 255; Stewart v. Booker T. Washington Ins. Co., 232 F.3d 844, 848 (11th Cir. 2000); Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Circ. 1999). Thus, "the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. "The nonmovant need not be given the benefit of every inference but only of every reasonable inference." Graham, 193 F. 3d at 1282 (quoting Brown v. City of Clewiston, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).

### Race Discrimination Termination Claim

Ford alleges that he was racially discriminated against in violation of Title VII and 42 U.S.C. § 1981 with respect to his termination from employment. To establish a prima facie case of a discriminatory discharge, Ford must establish four elements: first, he must show he is a member of a protected group; second, he must prove he was qualified for the position from which he was terminated; third, he must show he was terminated; and finally, he must present evidence that he was replaced by a person outside the protected class, i.e., a white individual, or that he was terminated while similarly situated white employees were retained. See Weaver v. CASA Gallardo, Inc., 922 F.2d 1515, 1525 (11th Cir. 1991); Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984).

For purposes of summary judgment, Glasforms assumes that Ford can meet the first three elements of his prima facia case. With respect to the fourth element, however, Ford has not presented any evidence that someone outside the protected class replaced him. Therefore, he must present evidence that a similarly situated white employee was treated more favorably than he was treated. Ford has not met his burden because he presented no evidence that a white employee was not terminated for failing to sign an Adjustment Form or any other Glasforms document. In fact, Glasforms presented evidence that other employees, one of whom was white, were terminated for failing to sign company forms.

Ford argues, however, that similarly-situated employees were not asked to sign a form stating that they would not be compensated for passing the Machine Operator I test. Even assuming that these employees are relevant to Ford's termination claim, none of Ford's alleged comparators have been shown to be similarly situated to him "in all relevant respects," as this circuit requires. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). Specifically, none of these individuals received additional compensation for passing the Machine Operator I test while holding a different job in the same pay grade as the Machine Operator I position, pay grade "B".

Ford points to Dathan Guza, a white former employee, as a comparator. Ford argues that Guza was transferred from the Production Assistant position, a pay grade "A" position, to the Machine Operator II position, a pay grade "C" position, without first holding and passing the test for the Machine Operator I position. Even if the court assumed that Ford's contention is relevant to his termination claim, which it is not, such contention is erroneous. Ford's assertion is based upon a Pay Adjustment Form that states that Guza received a pay increase as a result of a "score of 86% on Machine Operator II…" (Eakins depo., PX 8). However, the evidence is undisputed that at the time Guza received this pay increase Glasforms was overhauling its testing procedures for employees in the Production Department who worked with radio frequency machines. At this time, Glasforms determined that the test that had previously been given as the Machine Operator II test was more appropriate as an entry level skills test for any Machine Operator I in a radio frequency position. When Guza took the test to become a Machine Operator I on the radio frequency machines, the old

681075.1      7

Machine Operator II test had not been reprinted as the new Machine Operator I test for a radio frequency position. Therefore, the test still labeled (perhaps erroneously) for "Machine Operator II" was utilized for the Machine Operator I position. Ford does not dispute that after passing the test, Guza was placed in the Machine Operator I position, not the Machine Operator II position. Therefore, Guza did not skip over the Machine Operator I position to the Machine Operator II position. Thus, Guza was not treated more favorably than Ford and is otherwise not similarly situated to Ford.

The court finds that Ford has failed to establish a prima facie case of race discrimination with respect to his discharge. Even assuming Ford had established a prima facie case of race discrimination, he has not presented sufficient evidence that Glasforms's reason for terminating his employment--his failure to sign the Adjustment Form--is a pretext for race discrimination. The plaintiff did not dispute that Ford was terminated for failing to sign the Adjustment Form, and the plaintiff presented no evidence that his race was a motivating factor in the decision. Accordingly, Ford's race discrimination termination claim is due to be summarily dismissed.

### Race Discrimination Promotion or Compensation Claim

At oral argument, Ford's counsel alleged that Ford was racially discriminated against with respect to promotion or compensation arising out of Glasforms's request that he sign the Adjustment Form that stated that he must take and pass the Machine Operator I test with no additional compensation before being eligible for promotion to the Machine Operator II position and a pay increase. Such claim cannot be maintained. Ford never took and passed the Machine Operator I test. In addition, Ford's claim fails for the reasons stated above with respect to his race discrimination termination claim, including his inability to present evidence that a similarly situated white employee was treated more favorably. To the extent Ford has asserted a race discrimination promotion or compensation claim separate from his termination claim, summary judgment is warranted.

### Retaliatory Termination Claim

Ford also alleges that he was unlawfully retaliated against in violation of Title VII and 42

681075.1       8

U.S.C. § 1981 with respect to his termination. To establish a prima facie of retaliation, Ford must establish the following: (1) he was engaged in protected opposition; (2) he was terminated simultaneously with or subsequent to such opposition; and (3) a causal link existed between the protected opposition and the termination. Tipton v. Canadian Imperial Bank of Commerce, 872 F.2d 1491, 1494 (11th Cir. 1989).

Glasforms argues that Ford cannot establish protected opposition because he did not have a good-faith objective belief that he was subjected to racial discrimination. See Weeks v. Harden Manufacturing Corp., 291 F.3d 1207, 1311 (11th Cir. 2002) (a plaintiff must show that his belief that the employer was engaged in an unlawful employment practice was objectively reasonable in light of the facts and record presented). This court agrees that Ford did not have an objectively reasonable belief that Glasforms had racially discriminated against him for the same reasons his race discrimination claims have no merit, as discussed above. Plaintiff offered no evidence that Ford was treated less favorably than similarly situated white employees, and therefore, his belief could not have been objectively reasonable. The court, therefore, finds that Ford was not engaged in protected opposition.3

Further, Ford cannot establish the causal connection element of his prima facie case. Prior to his complaint that white employees were treated differently, Glasforms informed Ford that he would be fired if he did not sign the Adjustment Form. Therefore, the decision that Ford's employment would be terminated if he continued to refuse to sign the Adjustment Form was made, and he was informed of the decision, *before* his alleged opposition was made. Thus, Ford has not established a prima facie case of retaliation.

Even assuming Ford established a prima facie case of retaliation, his retaliation does not survive summary judgment. Ford has not presented any evidence that Glasforms's legitimate, non-

---

3 Glasforms further argued that Ford did not participate in protected opposition because of the manner in which Ford opposed alleged discrimination, which in this case, was insubordination for failing to sign the Adjustment Form. Because the court finds that Ford did not participate in protected opposition for another reason, it need not address Glasforms's alternative argument.

681075.1      9

retaliatory reason for his termination was a pretext for unlawful retaliation. As stated above, Ford presented no evidence that he was terminated for any reason other than his failure to sign the Adjustment Form. Consequently, summary judgment is warranted on Ford's retaliation claim.

### Conclusion

Glasforms established that it is entitled to summary judgment on all of Ford's claims on the grounds discussed herein. The court will enter a separate order granting summary judgment for Glasforms.

DONE and ORDERED this 7th day of January, 2004.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE